**Banks Anthony STOKES #36656–133**

v.

**UNITED STATES of America.**

**Civ. A. No. 73–586–W.**

United States District Court,
D. Maryland.

Nov. 12, 1973.

Banks Anthony Stokes, pro se.

George Beall, U. S. Atty., for the District of Maryland and Barnet Skolnik, Asst. U. S. Atty. for the District of Maryland, Baltimore, Md., for respondent.

## MEMORANDUM OPINION AND ORDER

WATKINS, Senior District Judge.

Petitioner, Banks Anthony Stokes, has filed a motion to vacate sentence pursuant to 28 U.S.C. § 2255 on the grounds that his guilty plea was involuntary. Fed.R.Cr.P. 11. The factual basis alleged for this contention is fully set out below.

Petitioner states in his petition:

This allegation is based upon threats made to petitioner on April 10, 1969, in the bull-pen of the United States Marshal's Office, by F.B.I. agent FRANK O'NEAL. Whereas, said agent threaten to file aiding and abetting bank robbery criminal charges against petitioner's sister-in-

law, Mrs. Mammie Stokes, file harboring a fugitive from justice criminal charges against petitioner's mother, Mrs. Lottie Stokes, file unlawful possession of unregistered fire arms criminal charges against petitioner's girlfriend, Miss Maxine Burly, and further threaten to move the Court for imposition of the 25 years maximum sentence on both offenses, if petitioner refuses to give said agent a signed statement confessing to the February 21, 1969, robbery of the Golden Prague Building, Loan and Savings Association, 2921 McElderry Street, Baltimore, Maryland, and the March 17, 1969, robbery of the Equitable Trust Company, Mt. Royal Office, 1121 North Eutan Place, Baltimore, Maryland. Wherefore, said agent then promised petitioner he will withhold the filing of any criminal charges against petitioner's sister-in-law, mother, girlfriend, and see that petitioner receives a light sentence not exceeding twelve (12) years on both sentences and running concurrently, if petitioner gives said agent a signed statement confessing to both said offenses charged in Cr. Nos. 28613 and 28614. [Literal Transcription].

I

It is interesting that such a motion should now be raised by Petitioner in light of what has gone before. The record contains a series of letters to Petitioner from his attorney (four in number) which carefully map the evolution of the guilty plea.[1] An examination of these letters demonstrates that Petitioner was fully apprised, even prior to the tendering of his guilty plea, of all the relevant factors which should have shaped his ultimate decision and they establish a sound basis for it totally independent of any alleged coercion.

The transcript of the rearraignment at which Petitioner withdrew his plea of not guilty and entered the guilty plea which he now seeks to avoid, also belies

his contention. While the significance of the Rule 11 inquiry will be discussed below, it should be noted at this juncture that Petitioner's attorney fully spelled out for the record a detailed description of his representation of Petitioner which corroborates the letters mentioned above.

Following the sentencing of July 16, 1969, Petitioner sent a letter dated January 24, 1970, to this Court thanking this writer "for everything that you have did [sic] for me within your powers." Obviously, at this point Petitioner had not yet "remembered" all the F.B.I. coercion which had lead him to plead guilty.

This letter was followed by another letter to the Court dated May 5, 1970, seeking to have his sentence reduced in which Petitioner acknowledged his guilt and attempted to mitigate it by explaining that he was driven to robbery by his alcoholism.

It is strange that if Petitioner were coerced into his guilty plea by the threats alleged to have been made on April 10, 1969, that he has waited over four years to come forward and raise such a contention and has in fact come forward on a previous occasion with a totally unrelated claim pursuant to 28 U.S.C. § 2255. Certainly, Petitioner must have been aware when he filed the first claim that the instant claim existed, if in fact it ever existed. While the delay in bringing a known claim is probably insufficient to cause its dismissal, Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), it certainly tends to deprive it, to some degree, of credibility.

II

In order for a court validly to accept a guilty plea, the court must determine by personally addressing the defendant "that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea." Fed.R.Cr.P. 11. Petitioner in

1. See Appendix.

the instant case, by his allegation, questions the voluntariness of this plea. "A guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void." Machibroda v. United States, 368 U.S. 487, 493, 82 S.Ct. 510, 513, 7 L.Ed.2d 473 (1962).

The question immediately arises of how to deal with an allegation such as the one Petitioner makes. The majority opinion in *Machibroda* evoked a dissent by Mr. Justice Clark who pointed out that "Once the [majority] opinion goes the rounds of our prisons, we will likely be plagued with a rash of such spurious applications." *Id.* at 497, 82 S.Ct. at 515. The majority countered:

> There will always be marginal cases, and this case is not far from the line. But the specific and detailed

factual assertions of the petitioner, while improbable, cannot at this juncture be said to be incredible. If the allegations are true, the petitioner is clearly entitled to relief. Accordingly, we think the function of 28 U.S.C. § 2255 can be served in this case only by affording the hearing which its provisions require. *Id.* at 496, 82 S. Ct. at 514.

In the instant case, Petitioner's allegations *standing alone* are also improbable, but not incredible.[2] However, pursuant to the directive of Rule 11 this Court personally addressed Petitioner and carefully inquired after the existence of any coercion or other factor which might vitiate the voluntariness of the plea.[3]

---

2. Probably Petitioner's allegations are closer to the proverbial line than those in *Machibroda*.

3. THE COURT: Now, do you further understand that—I am sure this has been explained to you, but this is very important, that if I accept the pleas, we start from here forward, and you can't later go back, and you can't later contend that you did not make the statements in question, that the identification was bad because of a faulty lineup, or because your identity was suggested to somebody; *you can't contend that the statements were beaten out of you*, or you were not advised of your rights; you have lost the right to contest the conviction and sentence because of anything which has previously occurred? And, let me put it to you crudely, it means this: *If you get a sentence and you go to the penitentiary, and the wise guys there say you ought to file a motion because* you really didn't know what you were doing, they framed you, the FBI didn't tell you your rights; *three of them had guns pointed at you when you made your statements*; the identifications were bad—don't listen to them, because *it isn't going to mean a thing.* We start from today forward, and we don't start from today and go back. *You understand?*

THE DEFENDANT: *Yes, sir.*

THE COURT: *All right, now, sir, in tendering the pleas, has any pressure been put on you?*

THE DEFENDANT: *No, sir.*

THE COURT: *By anybody, in any form, any coercion, duress, intimidation, threats,*

coercion *of any kind by anybody to make you plead guilty?*

THE DEFENDANT: *No, sir.*

THE COURT: Now, let me give you the first part before I ask you the second part here. I am going to ask you about inducements.

Now, except for the fact that you hope that if you plead guilty to the second count of the first indictment and the first count of the second indictment, that the Government will not press, will nol pros, the remaining counts of each indictment, *has any promise been made to you, or inducement held out to you?*

THE DEFENDANT: *No, sir.*

THE COURT: Mr. Hornstein covered it, but I will ask you specifically: *Has anybody tried to tell you what sentence I will impose?*

THE DEFENDANT: *No, sir.*

THE COURT: Has anybody told you that you don't have to worry, that this is an easy Judge?

THE DEFENDANT: *No, sir.*

THE COURT: Has anybody told you that because of what you have done and all of your cooperation, you are going to get probation?

THE DEFENDANT: *No, sir.*

THE COURT: *Then are you pleading guilty voluntarily*, because you did do the offenses with which you are charged?

THE DEFENDANT: *Yes, sir.*

THE COURT: *You mean that?*

THE DEFENDANT: *Yes, sir.*

THE COURT: *No reservations?*

THE DEFENDANT: *No, sir.*

If a Rule 11 inquiry is not to become a futile exercise, should not Petitioner's own denial that he has been coerced and his own statement that his plea is a voluntary one grounded on his guilt suffice? The Court of Appeals of this Circuit has recently addressed this very question in the context of an alleged broken plea bargain promise. In Walters v. Harris, 460 F.2d 988 (4 Cir. 1972) the court held that strict compliance with Rule 11, *as it then stood,* could not preclude such collateral attacks on the plea. The Court stated at p. 993:

> Examination of the defendant alone will not always bring out into the open a promise that has induced his guilty plea. It is well known that a defendant will sometimes deny the existence of a bargain that has in fact occurred, . . . out of fear that a truthful response would jeopardize the bargain.

> If the judge, the prosecution, or the defense counsel makes a statement in open court that is contrary to what he has been led to believe, especially as to promises by the prosecutor or his defense counsel, . . . [the defendant] would no more challenge the statement in open court than he would challenge a clergyman's sermon from the pulpit. [Citations omitted].

To remove the possibility that a plea bargain might go undiscovered and then later be the source of collateral attack, the Court expanded the Rule 11 inquiry to include:

> I now inquire of the United States Attorney and of the prisoner and his counsel whether or not there have been plea negotiations. Before permitting you to respond, I advise you that the United States Supreme Court has specifically approved plea bargaining and has said it is 'an essential component of the administration of justice . . . . to be encouraged.' You may, therefore, advise me truthfully of any plea negotiation without the slightest fear of incurring disapproval of the court. *Id.*

The Court felt that if this question were asked and a negative response were received this "would finally conclude the subject matter and prevent subsequent litigation." *Id.*

█ It is not clear to this Court how this last statement can be reconciled with the earlier statement in *Walters,* quoted above, "that a defendant will sometimes deny the existence of a bargain that has in fact occurred." Evidently by the court making the questions sufficiently specific a defendant forecloses any further inquiry into a subject when he gives a definitive answer. This being the case, it should follow *a fortiori* that where defendant has in response to at least five inquiries in the Rule 11 colloquy in the instant case (see emphasized matter of Footnote 3 above), specifically denied that which he alleges herein, he too is foreclosed from thereafter changing his mind and collaterally attacking on that specific subject.

### III

It may be argued that the *Walters* inquiry is distinguishable from an inquiry into possible coercion on the ground that the defendant's fear which arises from the alleged coercion is not alleviated as it supposedly would be by the *Walters* inquiry. If the central thrust of *Walters* is the narrower reading, that the advice given the defendant that a plea bargain is "specifically approved" by the Supreme Court will relieve such defendant of the fear of speaking up, then that

THE COURT: Mr. Skolnik, do you know of any reason why I should not accept the pleas?

MR. SKOLNIK: I do not, sir.

THE COURT: Mr. Hornstein, do you?

MR. HORNSTEIN: Your Honor, for the record, I would like to offer the correspondence,

THE COURT: First, do you know of any reason why—

MR. HORNSTEIN: No, sir.

THE COURT: All right.

Transcript p. 19–22 [Emphasis added].

case is distinguishable from the instant case. This Court does not so read *Walters*.

However, such a narrow reading would require that the decision of the instant case not be left to rest on the Rule 11 inquiry. Does this mean that the only alternative is a plenary hearing with Petitioner claiming coercion and the F.B.I. agent denying it? This Court does not feel so constrained in its available courses of action, although such an approach might be far simpler in this individual case.[4]

*Machibroda, supra,* while establishing the need for an inquiry in allegations of coercion, specifically rejected the requirement of a plenary proceeding in all cases.

> What has been said is not to imply that a movant must always be allowed to appear in a district court for a full hearing if the record does not conclusively and expressly belie his claim, no matter how vague, conclusory, or palpably incredible his allegations may be. The language of the statute does not strip the district courts of all discretion to exercise their common sense. Indeed, the statute itself recognizes that there are times when allegations of facts outside the record can be fully investigated without requiring the personal presence of the prisoner.

*Michibroda, supra,* 368 U.S. at 495, 82 S.Ct. at 514.

A broad discussion of the question of possible methods of disposition of this class of allegation was had in Raines v. United States, 423 F.2d 526 (4 Cir. 1970). There the Court of Appeals expounded on three techniques: summary disposition, disposition on an expanded record and an evidentiary hearing with or without petitioner's presence.

Clearly, summary disposition is inappropriate in this case if the narrower reading of *Walters* is adopted since the petition then is not "frivolous or patently absurd on its face." *Raines, supra* at 529.

As to a disposition on an expanded record, Judge Craven wrote in *Raines:*

> Unless it is clear from the pleadings and the files and records that the prisoner is entitled to no relief, the statute makes a hearing mandatory. We think there is a permissible intermediate step that may avoid the necessity for an expensive and time consuming evidentiary hearing in every Section 2255 case. It may instead be perfectly appropriate, depending upon the nature of the allegations, for the district court to proceed by requiring that the record be expanded to include letters, documentary evidence, and, in an appropriate case, even affidavits. United States v. Carlino, 400 F.2d 56 (2nd Cir. 1968); Mirra v. United States, 379 F.2d 782 (2nd Cir. 1967); Accardi v. United States, 379 F.2d 312 (2nd Cir. 1967). *When the issue is one of credibility, resolution on the basis of affidavits can rarely be conclusive, but that is not to say they may not be helpful.*

At p. 529–530 [Emphasis added].

■ To be sure, Petitioner's allegation does raise an issue of possible credibility and as such it must be viewed in the light of all the surrounding circumstances. In Part I of this opinion, this Court concluded that standing alone, the allegation while improbable, was not incredible and therefore not frivolous on its face. It now becomes necessary to examine all the circumstances surrounding the Petitioner's claim and then to attempt to determine it's juxtaposition with the *Machibroda* line between improbable and incredible.

---

4. It is obvious, that while a perfunctory hearing would avoid the difficult problem of analysis involved herein, it would ignore the more pressing problem of "spurious applica-

tions" referred to by Mr. Justice Clark in *Machibroda* and sought to be remedied by the Court of Appeals in *Walters.*

### Affidavits

Agent O'Neil, in his affidavit, categorically denies every aspect of Petitioner's allegation. *Raines* authorizes the court to consider affidavits as part of the expanded record, caveating that a credibility question can rarely be decided on that basis. However, as will be seen from the discussion to follow, it will be but one factor out of eight which this Court weighs in making its decision.

### Awareness by Defense Counsel

Petitioner states that he apprised his court-appointed attorney of the details of the alleged coercion several days prior to the rearraignment at which Petitioner entered the plea in question. If this is true, then his attorney's statements at the rearraignment are also drawn into question and in fact his entire representation of the defendant comes under suspicion. Counsel spelled out in detail what had transpired between himself and Petitioner and represented to the court what plea bargaining had taken place. Yet, Petitioner says that his attorney told him "to stick to his end of the deal, and that he will see to it that the government sticks to theirs", clearly implying a further deal beyond that which the transcript of the rearraignment reveals. Thus, the F.B.I., the prosecution and his own attorney are alleged to have complicity in coercing this plea.

### The Court's Involvement

Moreover, Petitioner's arguments bring this Court's integrity into question. He alleges that he was *assured* a maximum sentence of twelve years as part of the allegedly coerced deal.

Petitioner did subsequently receive a sentence of twelve years and that decision was made without any consultation with any person, but on the basis of the presentence investigation. If Petitioner is to be believed, it resulted from the coerced deal and therefore includes the Court as a conspirator in such a deal.

### Rule 11 Inquiry

The Rule 11 inquiry was discussed earlier in this opinion and suffice it to say that despite its thoroughness, it would have to be totally disregarded and Petitioner's own statements considered to be outright lies, if Petitioner is to be believed in his present allegation.

### Delay In Bringing Claim

This too has been discussed earlier and needs little elaboration except to reiterate the increased dubiety which results.

### Admissions of Guilt

Petitioner admitted his guilt at the rearraignment and in his letter to this Court seeking reconsideration of his sentence and has, to date, never denied it.

### Letters of Attorney

These letters clearly indicate a guilty plea which evolved out of a proper attorney-client relationship which produced a well informed defendant who plead guilty on the basis of his guilt in fact.

### Thank You Note to Court[5]

This note received shortly after the sentencing casts further doubt on Petitioner's current veracity.

Weighing all these factors together, this Court feels compelled to hold that Petitioner has crossed the *Machibroda*

---

5.   Received 1-28-70
     Banks Anthony Stokes
     200 19th Street S.E.
     Washington 20003, D. C.
     January 24, 1970
United States District Court
Judge R. D. Watkins
Baltimore 21202 Maryland
  Dear Sir:
  I, Banks Anthony Stokes. Nos 28613 and 28614 am writing this letter to show my appreciation, not only for myself—but for my family and Mr. Jacob D. Hornstein, Esq.
  And to say think you for everything that you have did for me within your powers on January 15, 1970.

  With best wish, I remain
          Your Truly

          BANKS A. STOKES
          [Literal Transcription]

line from the improbable to the incredible and will therefore deny the motion attacking the sentence imposed.

For the reasons hereinabove noted, the motion is denied.

Leave to file in forma pauperis has heretofore been granted.

## APPENDIX

The letter of May 9, 1969:
Mr. Banks A. Stokes
Baltimore County Jail
Towson, Maryland 21204

Dear Mr. Stokes:

You will recall that I visited you on Saturday, April 19, 1969 and delivered to you a copy of the Order of the U.S. District Court whereby I was appointed to defend you on charges of bank robberies. Indictments have now been returned against you by the Grand Jury in Criminal Nos. 28613 and 28614.

I shall visit you shortly to discuss these matters with you as you will be arraigned in Court about June 16, 1969. At that time you will be required to enter a plea of either guilty or not guilty. Prior to this hearing, you must write me a letter instructing me what plea you wish to enter.

I shall explain these details to you when I see you shortly.

With best wishes, I remain.

Very truly yours,

## JACOB B. HORNSTEIN

The letter of May 16, 1969:
Mr. Banks A. Stokes
Baltimore County Jail
Towson, Maryland 21204

Dear Mr. Stokes:

Herewith copies of your F.B.I. interviews dated April 11, 1969 and April 15, 1969.

I have asked the jail authorities to furnish you medical attention for your stomach and back complaints.

Kindly instruct me in writing whether you wish to enter a plea of guilty or not guilty at your arraignment next month in the Federal Court.

With best wishes, I remain.

Very truly yours,

## JACOB B. HORNSTEIN

The letter of May 29, 1969:
Mr. Banks A. Stokes
Baltimore County Jail
Towson, Maryland 21204

Dear Mr. Stokes:

Herewith copies of your indictments in cases 28613 and 28614 pending in Federal Court. After leaving you at the conclusion of my visit on May 15, 1969, I particularly asked the guard captain to arrange for a doctor to examine you. I have today requested the U. S. attorney's office to have the U. S. Marshall arrange medical examination promptly to determine whether you are in need of treatment.

The U. S. Marshall will also instruct the jail authorities to afford your family customary visiting privileges in order that they may see you regularly. I am informed that a preliminary hearing will be held either on June 6, 1969 or June 13, 1969 at which time you will be required to enter a plea of guilty or not guilty.

I spent an hour with you on May 15, 1969 when I went over with you in great detail the FBI interviews dated February 24, 1969 and April 15, 1969, copies of which I mailed to you the next day. You now have in your hands all relevant evidence and you now readily see that you have been identified by bank employees who were eye witnesses to both robberies, namely; Joseph Platek and Mrs. Forest Kreisel. Even without your confession, such eye witness identification would likely result in your conviction unless at trial I was able to create sufficient doubt in the certainty in the witnesses' recollection.

I shall review these matters in detail with you on Tuesday, June 3, 1969 when I shall again visit you. With best wishes, I remain.

Very truly yours,

JACOB D. HORNSTEIN

The letter of July 11, 1969:

Mr. Banks Anthony Stokes
Baltimore County Jail
Baltimore, Maryland

Dear Mr. Stokes:

Your case has been assigned for rearraignment on July 17, 1969 at 2:00 p. m. so that you may change your plea from not guilty to guilty.

The court will hold a short hearing and then order a pre-sentence investigation to secure full information regarding your personal history, background and prior record. Thereafter, you will be brought back for sentencing at which time the District Attorney will inform the court whether or not you have assisted in the state prosecution of Robinson, Rice and Evans.

The Government will require you to plead guilty to the 1st count of one indictment and the 2nd count of the other. The first count, armed robbery carries a maximum sentence of 20 years, the second count carries 10 years. The court will impose a long sentence and no one can tell you in advance how much it will be. However, if the Government's Attorney informs the court that you have rendered valuable assistance, the court will give consideration to this in fixing sentence less than the maximum.

I will discuss with you in detail the morning of the hearing any further questions you may have.

With Best Wishes, I remain.

Very truly yours,

JACOB D. HORNSTEIN